IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

LORI TUCKER,

    **Plaintiff,**

v.                            CIVIL ACTION No. 1:19-00227

PRINCETON COMMUNITY HOSPITAL
ASSOCIATION, INC., et al.,

    **Defendants.**

## MEMORANDUM OPINION AND ORDER

### I.  Background

This case is grounded in plaintiff's allegation that she, a physician specializing in obstetrics and gynecology ("OB/GYN"), was subjected to investigation and loss of hospital privileges after speaking out on the issue of abortion during the 2016 national election cycle.  According to the allegations in the Amended Complaint, which are taken as true at this stage in the proceedings, plaintiff Lori Tucker is a board-certified OB/GYN physician licensed to practice medicine in West Virginia and Ohio.  See Amended Complaint at ¶ 4 (ECF No. 18).  In 2002, Dr. Tucker began practicing medicine in West Virginia and had hospital and/or staff privileges at Princeton Community Hospital Association, Inc. ("PCH") starting in 2005.  See id. at ¶¶ 13-15. Jeffrey Lilley, Frank Sinicrope, Joe C. Ellington, Jr., Wallace Horne, Wesley L. Asbury, Marshall C. Long, Christopher Daniel, Jeffrey T. Gee, Eric S. Hopkins, Amos Lane, Brandon Lingenfelter,

Thomas Charles Martin, Jr., Sherri B. Ross, and Todd Smith are alleged to be employees or agents of PCH and "at all times relevant to this action" members of PCH's Medical Executive Committee ("MEC").  <u>Id.</u> at ¶ 7.

Dr. Tucker alleges that "[d]uring the 2016 national election cycle, and particularly during the campaign for President of the United States, [she] became concerned that facts about abortion were being misrepresented in the media."  <u>Id.</u> at ¶ 21.  In order "to correct misperceptions that she had identified in the national debate over abortion", Dr. Tucker recorded and published a video that was published on Facebook and "quickly went viral."  <u>Id.</u> at ¶¶ 23 and 24.

Eric Porterfield, the minister of Rich Creek Baptist Church in Spanishburg, West Virginia and founder of Blind Faith Ministries, is an outspoken opponent of abortion.  <u>See</u> <u>id.</u> at ¶ 8.  After becoming aware of Dr. Tucker's video, "Porterfield contacted Tucker and demanded that she retract the video and repent for the views she expressed in it."  <u>Id.</u> at ¶ 26.  When Dr. Tucker refused to do so, "Porterfield threatened that Tucker would see wrath come against her because of her position on abortion."  <u>Id.</u> at ¶ 28. "Porterfield exercised considerable influence in the Princeton and surrounding areas [and] has since been elected to the West Virginia House of Delegates."  <u>Id.</u> at ¶ 31.  Allegedly, Porterfield communicated to individuals

2

associated with PCH "his desire to destroy Tucker's medical practice, have her removed from her service at the Hospital, and otherwise suffer what he determined should be the consequences of her views on abortion."  Id. at ¶ 30.

Dr. Tucker also appeared on national television advocating for the use of suboxone in treating pregnant women suffering from addiction.  See id. at ¶¶ 32-33.  According to Dr. Tucker, PCH did not support the use of suboxone to treat expectant mothers and newborns.  See id. at ¶ 34.

On March 29, 2017, Dr. Tucker was called to a meeting with Dr. Wesley Asbury, PCH's Chief of Staff, and Dr. Wallace Horne, PCH's Chief Medical Officer and Vice President of Medical Affairs.  See id. at ¶ 36.  "Dr. Asbury and Dr. Horne sought to restrict Dr. Tucker from performing any surgical procedures, but agreed she could continue to perform C-sections and outpatient surgeries other than hysterectomies or other major surgical procedures."  Id. at ¶ 37.  According to Dr. Tucker, "[n]o explanation was provided, deficiencies explained, or correction plan provided."  Id.

However, in the next paragraph of her complaint, Dr. Tucker states that Dr. Asbury presented her with a letter listing more than 30 cases which were being referred for peer review.  See id. at ¶ 39.  Of those 30 cases, Dr. Tucker contends that more than half of those "cases had previously been reviewed internally as

3

part of the hospital's standard credentialing process without any issues having been revealed." Id.  Dr. Tucker alleges that "[a]dditional reviews beyond that conducted during credentialing and recredentialing was outside the normal practice" at PCH.  Id.

Ultimately, documentation for twelve of Dr. Tucker's cases was sent for a peer review by the Greeley Company.  See id. at ¶ 40.  Dr. Tucker maintains that the information sent to Greeley was "incomplete, false, and misleading" and "included treatment rendered by providers other than Tucker".  Id. at ¶ 41.  Greeley rendered an adverse peer review of Dr. Tucker based solely on the information provided by PCH.  See id. at ¶ 45.

As a result of the adverse peer review, Dr. Tucker was prohibited from performing any surgeries at PCH and "was told that there were persons who never wanted her to practice medicine again."  Id. at ¶ 46.  According to Dr. Tucker, PCH's bylaws "dictated that an investigation be undertaken" but that one never occurred.  Id. at ¶ 47.

Dr. Tucker alleges that the Hospital Defendants "made, or caused to be made, false and adverse reports about [her] to the National Practitioner Data Bank (NPDB)."[1]  Id. at ¶ 49.  Those

---

[1] "The National Practitioner Data Bank ("NPDB") is 'a web-based repository of reports containing information on medical malpractice payments and certain adverse actions related to health care practitioners, providers, and suppliers,' and is 'a workforce tool that prevents practitioners from moving state to state without disclosure or discovery of previous damaging performance.'"  Obi v. Exeter Health Res., Inc., Civil No. 18-cv-

reports to the NPDB "damaged Dr. Tucker in her professional reputation, resulted in diminished professional opportunities for her, and led to a false conclusion that Dr. Tucker's complication rate for OB/GYN care was above the national average, when, in fact, it was below the national average." Id. at ¶ 50.

Dr. Tucker alleges that the Hospital Defendants "prepared a letter recommending to the Hospital Board of Directors that terms be imposed upon Dr. Tucker substantially restricting her surgical privileges and allowing her to only perform unrestricted vaginal deliveries". Id. at ¶ 54.  That letter was never delivered; however, "[g]iven the impossible restrictions unreasonably placed on her by the Hospital Defendants, essentially prohibiting her from practicing medicine, Dr. Tucker left her position with the Hospital." Id. at ¶ 57.  Afterwards, the Hospital Defendants reported to the NPDB the recommendations that had been included in its letter to the Board which, according to Dr. Tucker, was improper under the NPDB's procedures and policies.  See id. at ¶¶ 58-61.

Dr. Tucker also alleges that the Hospital Defendants sent an adverse report to the West Virginia Osteopathic Board of Medicine which was based upon the unreliable Greeley adverse peer review.

---

550-SM, 2018 WL 5557062, at *1 n.1 (D.N.H. Oct. 2, 2018), report and recommendation adopted, 2018 WL 5456503 (D.N.H. Oct. 27, 2018)(quoting U.S. Dep't of Health & Human Servs., NPDB, About Us, https://www.npdb.hrsa.gov/topNavigation/aboutUs.jsp (last accessed Oct. 1, 2018)).

See id. at ¶¶ 63-64.  "In response to the adverse report, Dr. Tucker was forced to defend herself before the Osteopathic Board incurring substantial cost and attorney's fees."  Id. at ¶ 65.

Thereafter, Dr. Tucker was hired by the Veterans Administration Medical Center (VAMC) in Beckley, West Virginia, as its Chief of Staff.  See id. at ¶ 66.  Because of the reports made to the NPDB, however, VAMC rescinded its offer to hire Dr. Tucker as Chief of Staff.  See id. at ¶ 68.  According to Dr. Tucker, "[d]efendants had another motive for seeking to prevent [her] from being the Chief of Staff at the VAMC: PCH had been in talks with the VAMC to become a primary referral hospital for the VAMC in which it would receive approximately 40% of all referrals for treatment from the VAMC."  Id. at ¶ 70.  This referral arrangement would result in "a great infusion of patients and therefore money into PCH."  Id.  As Chief of Staff, Dr. Tucker would have to approve all referrals and "[g]iven how the Hospital Defendants had treated Dr. Tucker, they expected that if Dr. Tucker was Chief of Staff at the VAMC then she would not direct referrals to PCH."  Id. at ¶ 72.

Ultimately, Dr. Tucker had to relocate to obtain employment resulting in "great financial loss."  Id. at ¶¶ 75-76.

On March 28, 2019, Dr. Tucker filed a complaint against PCH and the City of Princeton alleging violations of her First and Fifth Amendment rights and asking for:  1) an award of damages to

compensate her for her loss of income, loss of her medical practice, and her emotional distress; 2) injunctive and declaratory relief directing defendants to correct misinformation previously reported to the NPDB, and 3) costs and attorney fees. See ECF No. 1.

On July 8, 2019, Dr. Tucker moved to amend her complaint. See ECF No. 10. That motion was granted and the Amended Complaint was filed on July 25, 2019. See ECF No. 18. Named as defendants are the City of Princeton, PCH, Jeffrey Lilley, Frank Sinicrope, Joe C. Ellington, Jr., Wallace Jennings Horne, Wesley L. Asbury, Marshall C. Long, Christopher Daniel. Jeffrey T. Gee, Eric S. Hopkins, Amos Lane, Brandon M. Lingenfelter, Thomas Charles Martin, Jr., Sherri B. Ross, Todd Smith, the National Practitioner Data Bank, and Eric Porterfield. The individual defendants, with the exception of Eric Porterfield, are all alleged to be members of the MEC and are referred to as the "MEC Defendants".[2] Throughout the First Amended Complaint, the MEC Defendants, along with PCH and the City of Princeton are referred to as the "Hospital Defendants". The Amended Complaint includes the following counts:

Count I:      Violation of First Amendment Rights against the Hospital Defendants;

---

[2] Plaintiff does not indicate whether the individual defendants are being sued in their individual or official capacities.

7

Count II:       Violation of Due Process Property Rights
                against the Hospital Defendants;

Count III:      Violation of Due Process Liberty Interest
                against the Hospital Defendants;

Count IV:       Intentional Interference with Contract
                against Eric Porterfield;

Count V:        Intentional Interference with Contract or
                Contract Expectancy against the Hospital
                Defendants;

Count VI:       Conspiracy to Injure in Trade or Profession
                (presumably against all defendants); and

Count VII:      Request for Injunctive Relief against the
                NPDB.

See Amended Complaint at ¶¶ 78-115.  The City of Princeton and

defendants Lingenfelter, Smith, and Porterfield were voluntarily

dismissed by plaintiff.  See ECF Nos. 19, 43, and 45.

     Pending before the court are:  1) a motion to dismiss filed

by the "hospital defendants"; 2) a motion to dismiss filed by the

"individual defendants"; and 3) National Practitioner Data Bank's

motion to dismiss or, in the alternative, for summary judgment.

ECF Nos. 46, 48, and 64.  Those motions have been fully briefed

and are ripe for decision.

## II. Standard of Review

     "[A] motion to dismiss for failure to state a claim for

relief should not be granted unless it appears to a certainty

that the plaintiff would be entitled to no relief under any state

of facts which could be proved in support of his claim."  Rogers

v. Jefferson-Pilot Life Ins. Co., 883 F.2d 324, 325 (4th Cir.

8

1989) (citation omitted) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 48 (1957), and <u>Johnson v. Mueller</u>, 415 F.2d 354, 355 (4th Cir. 1969)).  "In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff."  <u>Mylan Laboratories, Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir. 1993); <u>see also</u> <u>Ibarra v. United States</u>, 120 F.3d 474, 474 (4th Cir. 1997).[3]

In evaluating the sufficiency of a pleading, the cases of <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007), and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), provide guidance.  When reviewing a motion to dismiss, under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted, a court must determine whether the factual allegations contained in the complaint "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," and, when accepted as true, "raise a right to relief above the speculative level."  <u>Twombly</u>, 550 U.S. at 555 (<u>quoting</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957); 5 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1216 (3d ed. 2004)).

---

[3] Plaintiff filed a motion to strike certain statements made by defendants in their motions and memoranda that, according to her, go beyond the allegations in the Amended Complaint.  (ECF No. 60).  As the court has already stated, for purposes of motions under Rule 12(b)(6), the allegations in the complaint are taken as true.  Therefore, plaintiff's motion to strike is unnecessary and **DENIED** as moot.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." <u>Twombly</u>, 127 S. Ct. at 1969.  As the Fourth Circuit has explained, "to withstand a motion to dismiss, a complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" <u>Painter's Mill Grille, LLC v. Brown</u>, 716 F.3d 342, 350 (4th Cir. 2013) (<u>quoting</u> <u>Twombly</u>, 550 U.S. at 570).

According to <u>Iqbal</u> and the interpretation given it by our appeals court,

> [L]egal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes.  <u>See</u> <u>Iqbal</u>, 129 S.Ct. at 1949. We also decline to consider "unwarranted inferences, unreasonable conclusions, or arguments."  <u>Wahi v. Charleston Area Med. Ctr., Inc.</u>, 562 F.3d 599, 615 n. 26 (4th Cir. 2009); <u>see also</u> <u>Iqbal</u>, 129 S. Ct. at 1951-52.

> Ultimately, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Iqbal</u>, 129 S.Ct. at 1949 (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Facial plausibility is established once the factual content of a complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u>  In other words, the complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims "'across the line from conceivable to plausible.'"  <u>Id.</u> at 1952 (quoting <u>Twombly</u>, 550 U.S. at 570, 127 S.Ct. 1955).

> Satisfying this "context-specific" test does not require "detailed factual allegations."  <u>Id.</u> at 1949-50 (quotations omitted). The complaint must, however,

plead sufficient facts to allow a court, drawing on
"judicial experience and common sense," to infer "more
than the mere possibility of misconduct."  <u>Id.</u> at 1950.
Without such "heft," <u>id.</u> at 1947, the plaintiff's
claims cannot establish a valid entitlement to relief,
as facts that are "merely consistent with a defendant's
liability," <u>id.</u> at 1949, fail to nudge claims "across
the line from conceivable to plausible."  <u>Id.</u> at 1951.

<u>Nemet Chevrolet, LTD v. Consumeraffairs.com, Inc.</u>, 591 F.3d 250,

255-56 (4th Cir. 2009); <u>see also</u> <u>Midgal v. Rowe Price-Fleming</u>

<u>Int'l, Inc.</u>, 248 F.3d 321, 326 (4th Cir. 2001) ("The presence of

a few conclusory legal terms does not insulate a complaint from

dismissal under Rule 12(b)(6) when the facts alleged in the

complaint cannot support the legal conclusion.").

### III.  Analysis

A.  *Motion to Dismiss National Practitioner Data Bank*

According to NPDB, plaintiff's claims as to it should be

dismissed because: 1) plaintiff failed to exhaust her

administrative remedies under the Health Care Quality Improvement

Act of 1986 ("HCQIA"); and 2) plaintiff has failed to state a

claim against NPDB.

In her opposition to NPDB's motion, plaintiff alleges that

"NPDB participated in a conspiracy to injure [her] in her

profession."  ECF No. 85 at 7.  She further states that, although

she "does not allege that the NPDB possessed the animus or

personal malice against her that did other Defendants, but the

NPD[B], regardless of how unwittingly, has participated in

damaging Dr. Tucker in her profession."  <u>Id.</u>  According to

11

plaintiff, "the NPDB was a necessary party to the purpose of injuring Dr. Tucker in her profession." Id. at 8.

> West Virginia recognizes the tort of civil conspiracy as a cause of action. Jane Doe-1 v. Corp. of President of The Church of Jesus Christ of Latter-day Saints, 239 W. Va. 428, 801 S.E.2d 443, 458 (2017). "A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." Syl. Pt. 8, Dunn v. Rockwell, 225 W. Va. 43, 689 S.E.2d 255, 259 (2009). The cause of action is not created by the conspiracy itself but by the wrongful acts done by the defendants to injure the plaintiff. Id. "A civil conspiracy is not a per se, stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)." Syl. Pt. 9, Dunn, 689 S.E.2d at 259. A civil conspiracy must therefore be based on an underlying tort or wrong. O'Dell v. Stegall, 226 W. Va. 590, 703 S.E.2d 561, 596 (2010) (citing Dunn, 689 S.E.2d 255).

> In order for a civil conspiracy to be actionable, the plaintiff must prove that the defendants have committed "some wrongful act or have committed a lawful act in an unlawful manner to the injury of the plaintiff." Dunn, 689 S.E.2d at 268-69. A civil conspiracy may be proven by circumstantial evidence. See Jane Doe-1, 801 S.E.2d at 473. Although a civil conspiracy claim requires an underlying tort or harm resulting from the conspiracy, the conspiracy claim may be disposed of separately from the underlying cause of action. See id. at 458.

Blankenship v. Napolitano, 451 F. Supp. 3d 596, 620-21 (S.D.W. Va. 2020) (Copenhaver, J.).

> Unfortunately for plaintiff, her complaint is wholly devoid of any specific allegation regarding the actions of NPDB. Although plaintiff makes a general allegation that defendants

"conspired" to injure her in her trade and profession, she fails
to provide any facts about NPDB's conduct to support this
allegation.  Her complaint does not describe any interaction
between NPDB and the other defendants to support a conspiracy
claim involving NPDB.  Therefore, the court finds that plaintiff
has failed to state a plausible claim against NPDB because she
does not plead "factual content that allows the court to draw the
reasonable inference that [NPDB] is liable for the misconduct
alleged."  Iqbal, 556 U.S. at 678 (citing Twombly, 555 U.S. at
556); see also Weller v. Dep't of Soc. Servs. for City of Balt.,
901 F.2d 387, 397 (4th Cir. 1990) (affirming dismissal for
failure to state a claim as to two defendants because there were
no allegations against them).

For these reasons, the court **GRANTS** NPDB's motion to
dismiss.[4]

B. *Motion to Dismiss Individual Defendants*

Defendants Lilley, Sinicrope, Ellington, Horne, Asbury,
Long, Daniel, Gee, Hopkins, Lane, Martin, and Ross have moved for
dismissal of the claims against them arguing that "[t]his group
pleading does not give the Individual Defendants fair notice of
what Dr. Tucker claims they did to cause the alleged harm she
suffered."  ECF No. 49 at 4.  As noted above, plaintiff asserts

---

[4] The court does not reach the other grounds for dismissal
advanced by the NPDB.

that these defendants are all members of PCH's Medical Executive Committee and refers to them collectively as the "MEC Defendants".  See Amended Complaint at ¶¶ 7 and 20.[5]  The Complaint makes no allegations regarding how the MEC allegedly harmed plaintiff.  After asserting that she will refer to PCH and the MEC Defendants collectively as the "Hospital Defendants", plaintiff goes on throughout the remainder of her Complaint to refer only to "Hospital Defendants".  While plaintiff does allege that PCH's "clinical policies, procedures, and customs are controlled by the Chief Medical Officer, Chief of Staff, and the Medical Executive Committee," id. at ¶ 19, the phrase "MEC defendants" is not mentioned again.

As far as allegations against the specific individuals noted above, plaintiff alleges:

36.  On March 29, 2017, Dr. Tucker was directed to the hospital administrator's office to meet with Dr. Wes Asbury (Chief of Staff and member of the MEC) and Dr. Wallace Horne (Chief Medical Officer, Vice President of Medical Affairs and member of the MEC).  They did not give Dr. Tucker prior notice of the meeting nor any information regarding its subject matter.

37.  Dr. Asbury and Dr. Horne sought to restrict Dr. Tucker from performing any surgical procedures, but agreed she could continue to perform C-sections and outpatient surgeries other than hysterectomies or other major medical procedures.

---

[5] In their motion, defendants assert that Lilley, Sinicrope, Hopkins, and Horne are not even members of the MEC.  See ECF No. 49 at 3 n.4.  Of course, as discussed above, the court has accepted the allegations in the Amended Complaint as true.

> No explanation was provided, deficiencies
> explained, or correction plan provided.
>
>          * * *
>
> 39.    During the March 29, 2019 meeting, Dr. Asbury
> presented Dr. Tucker with a letter and stated,
> "just read it."  The letter referenced
> "complications" and listed more than 30 cases
> which were referred for peer review.

Id. at ¶¶ 36, 37, and 39.

The only other mention of individual defendants is the following:  "Defendants Ellington and Lingenfelter received great benefit from Dr. Tucker's ousting as their medical practices absorbed Dr. Tucker's patients resulting [in] great profits to them."  Id. at ¶ 53.

As the foregoing shows, the only arguable allegations against any of the individual defendants are the actions attributed to Drs. Asbury and Horne.  Plaintiff does not attribute any specific conduct to the remaining individual defendants, or the MEC for that matter.  Therefore, she fails to plead facts to allow the court to draw the reasonable inferences that these defendants are liable for the wrongful conduct alleged.  Accordingly, the motion to dismiss (ECF No. 48) is **GRANTED** as to defendants Lilley, Sinicrope, Ellington, Long, Daniel, Gee, Hopkins, Lane, Martin, and Ross.  However, the specific allegations against Drs. Horne and Asbury, along with the reasonable inferences that flow therefrom, are sufficient to withstand dismissal at this juncture.

15

The individual defendants also moved for dismissal on
statute of limitations grounds.  "Ordinarily, a defense based on
the statute of limitations must be raised by the defendant
through an affirmative defense, and the burden of establishing
the affirmative defense rests on the defendant."  Goodman v.
Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (internal
citation omitted).  "It follows, therefore, that a motion to
dismiss filed under Federal Rule of Civil Procedure 12(b)(6),
which tests the sufficiency of the complaint, generally cannot
reach the merits of an affirmative defense, such as the defense
that the plaintiff's claim is time-barred."  Id.; see also
Eastern Shore Markets, Inc. v. J.D. Assoc. Ltd. Partnership, 213
F. 3d 175, 185 (4th Cir. 2000) ("A Rule 12(b)(6) motion, however,
does not generally invite an analysis of potential defenses to
the claims asserted in the complaint.").  It is only "in the
relatively rare circumstances where facts sufficient to rule on
an affirmative defense are alleged in the complaint" that such a
defense may be reached by a 12(b)(6) motion.  Id.  Indeed, this
exception applies only "if all facts necessary to the affirmative
defense clearly appear[ ] on the face of the complaint."  Id.
(quoting Richmond, Fredericksburg & Potomac R.R. v. Forst, 4 F.3d
244, 250 (4th Cir. 1993)).

Here, the facts necessary to establish the affirmative
defense of the statute of limitations do not clearly appear on

the face of the Amended Complaint.  The only specific date that
appears in the Complaint is March 29, 2017.  While plaintiff
contends defendants took certain actions on that date, she goes
on to assert a number of other things that allegedly were done to
her after that date.  Those further allegations are not tied to
specific dates.  There may well be a statute of limitations
problem with plaintiff's complaint.  However, because the facts
in support of such a defense do not appear plainly on the face of
the complaint, the court cannot resolve it at this juncture.

    C. *Motion to Dismiss Hospital Defendants*

    The so-called Hospital Defendants, comprised of the
individual defendants and PCH, also filed a motion to dismiss on
a number of grounds.  With respect to the remaining defendants,
PCH, Asbury, and Horne, the court considers defendants'
arguments.

    1.  <u>Adverse employment action</u>

    "To establish a claim of First Amendment retaliation, a
plaintiff must show that (1) [s]he engaged in protected First
Amendment activity; (2) the defendant took action that adversely
affect h[er] First Amendment rights; and (3) there was a causal
relationship between the protected speech and the adverse
action."  <u>Braswell v. Haywood Reg. Med. Center</u>, 234 F. App'x 47,
52 (4th Cir. 2007) (citing <u>Suarez Corp. Indus. v. McGraw</u>, 202
F.3d 676, 685 (4th Cir. 2000)).  According to defendants, Count I

17

must fail because plaintiff does not allege that the Hospital Defendants took an adverse employment action against her resulting in a deprivation of a valuable benefit.

According to the Amended Complaint, after speaking out about abortion and suboxone treatment, defendants "determined to destroy Tucker's medical practice and to remove her from her position at the Hospital."  Amended Complaint at ¶ 35.  On March 29, 2017, her surgical privileges were restricted.  See id. at ¶ 37.  Dr. Tucker was also informed that a number of her cases, that had previously been reviewed internally without any issues having being revealed, were being referred for peer review.  See id. at ¶ 39.  According to Dr. Tucker, this was "outside of the normal practice" at PCH.  Id.  Ultimately, defendants sent twelve cases for peer review and, according to plaintiff, the information provided "was incomplete, false, and misleading." Id. at ¶ 41.  Once the adverse peer review was received, defendants prohibited Dr. Tucker "from performing any surgeries" at PCH and removed her from the "schedule for coverage of C-section procedures."  Id. at ¶¶ 46 and 51.

The court finds that plaintiff has alleged that she suffered an adverse action sufficient to withstand summary dismissal. While defendants argue that Dr. Tucker's staff privileges were never restricted, the court cannot resolve this issue solely by reference to the complaint.  For example, Dr. Tucker alleges that

18

she was prohibited from performing certain types of surgeries. Furthermore, while "the Fourth Circuit has not determined whether an investigation, standing alone, can give rise to a First Amendment retaliation claim," Roncales v. County of Henrico, 451 F. Supp. 3d 480, 483 n.13 (E.D. Va. 2020) (internal citation omitted), there is some authority to suggest that it can.  See Alexander v. City of Greensboro, No. 1:09-CV-934, 2011 WL 13857, at *16 n.15 (M.D.N.C. Jan. 4, 2011) ("An investigation may be a sufficient adverse action in the context of a retaliation claim.").  In this case, Dr. Tucker alleges more than a mere investigation.  She claims that she was subject to a one-sided retaliatory investigation and that, following that investigation, she was prohibited from performing surgeries on any kind at PCH.  Plaintiff has stated a First Amendment retaliation claim.

      2.   <u>Constitutionally protected property interest</u>

Defendants argue that they did not deprive Dr. Tucker of any property interest and, therefore, the court should dismiss Count II.  While acknowledging that "[a] physician has a property interest in his or her privileges", defendants argue that prohibiting Dr. Tucker from performing surgeries "is not the same as restricting or terminating Dr. Tucker's privileges."  ECF No. 47 at 9.  However, at least one court has concluded otherwise.  See Hamad v. Nassau Cty. Med. Center, 191 F. Supp. 2d 286, 299 (E.D.N.Y. 2000) ("[T]he Court notes that surgical privileges

19

constitute a property interest for purposes of due process and
that harm to reputation combined with the deprivation of a
property interest in surgical privileges give rise to a due
process liberty interest."). Ultimately, with the benefit of a
more-developed record and details regarding Dr. Tucker's
privileges, the court may accept defendants' argument. However,
at this juncture, plaintiff has sufficiently alleged the
deprivation of a constitutionally protected property interest.

        3.   <u>Liberty interest</u>

In Count III, Dr. Tucker alleges that she "has suffered and
will continue to suffer injury to her good name, reputation,
honor and/or integrity, and will continue to suffer pecuniary
loss, loss of employment, emotional pain, suffering,
inconvenience, mental anguish, loss of enjoyment of life and
other non-pecuniary loss." ECF No. 18 at 93. Defendants argue
that Count III should be dismissed because "mere injury to
reputation, even if defamatory, does not constitute the
deprivation of a liberty interest." ECF No. 67 at 3. Defendants
go on to cite cases that have held that submission of an
erroneous NPDB report is not a deprivation of a protected
interest. <u>See</u> <u>id.</u>

In her complaint, plaintiff does not tie Count III solely to
submission of the NPDB report. According to plaintiff, she was
denied procedural due process when defendants' actions threatened

her liberty interest in her reputation and choice of occupation.
ECF No. 62 at 8.  The United States Court of Appeals for the
Fourth Circuit has acknowledged that a person has a "right to due
process '[w]here a person's good name, reputation, honor, or
integrity is at stake because of what the government is doing to
him.'"  Sciolino v. City of Newport News, 480 F.3d 642, 646 (4th
Cir. 2007) (quoting Wisconsin v. Constantineau, 400 U.S. 433, 437
(1971)).  In Sciolino, the court noted that "an individual's
liberty interest in his reputation is only sufficient 'to invoke
the procedural protection of the Due Process Clause' if combined
with 'some more tangible interest [] such as employment'".  Id.
(quoting Paul v. Davis, 424 U.S. 693, 701 (1976)).  In Sciolino,
the court could not conclude whether the process given to
Sciolino in conjunction with his termination "fulfilled the
requirements of the Due Process Clause."  Id. at n.1.

Like the court in Sciolino, at this juncture, the court
cannot properly evaluate whether Dr. Tucker was given the
appropriate notice and opportunity to be heard.  Therefore, the
motion to dismiss Count III is denied.

4. Immunity

"Congress enacted the HCQIA afer a finding that there was an
'increasing occurrence of medical malpractice and the need to
improve the quality of medical care,' including, 'a national need
to restrict the ability of incompetent physicians to move from

State to State without disclosure or discovery of the physician's previous damaging or incompetent performance.'" Robinson v. East Carolina Univ., 329 F. Supp. 3d 156, 174 (E.D.N.C. 2018) (quoting 42 U.S.C. § 11101(1-2)). The HCQIA provides immunity for reports made to the NPDB pursuant to 42 U.S.C. § 11137. The Act provides in pertinent part:

> (c) Relief from liability for reporting
>
> No person or entity (including the agency designated under section 11134(b) of this title) shall be held liable in any civil action with respect to any report made under this subchapter (including information provided under subsection (a) without knowledge of the falsity of the information contained in the report.

42 U.S.C. § 11137(c). "Section 11137(c) immunity is complete: it provides immunity from both damages and suits for injunctive relief. . . ." Robinson, 329 F. Supp. 3d at 175 n.14. "Thus, immunity for reporting exists as a matter of law unless there is sufficient evidence for a jury to conclude the report was false and the reporting party knew it was false." Brown v. Presbyterian Healthcare Servs., 101 F.3d 1324, 1334 (10th Cir. 1996).

Dr. Tucker alleges that defendants made, or caused to be made, "false and adverse reports about Dr. Tucker to the National Practitioner Data Bank". ECF No. 18 at 49. She also contends that defendants made the reports to NPDB with actual malice. Construing those allegations in the light most favorable to Dr. Tucker, as the court must do on a motion to dismiss, it is

22

reasonable to infer that the information provided to NPDB was false and that defendants knew the information provided to NPDB was false.  Therefore, at this juncture, they are not entitled to immunity.

       5. <u>Civil Conspiracy</u>

    As for plaintiff's civil conspiracy claim, defendants argue that it should be dismissed because plaintiff does not allege a combination of two or more persons conspired against her. According to defendants, there is no conspiracy because a corporation and its agents cannot form a conspiracy.

    It is true that "agents and employees of a corporation 'cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage.'"  <u>Lee v. Allstate Ins. Co.</u>, Civil Action No. 5:10CV41 (STAMP), 2010 WL 4806886, at *3 (N.D.W. Va. Nov. 18, 2010) (quoting <u>Cook v. Heck's Inc.</u>, 342 S.E.2d 453, 460 (W. Va. 1986)). However, plaintiff at least arguably alleges that defendants' motives were personal and not entirely related to their official capacities.  For this reason, this issue is better resolved by a motion for summary judgment.

    Defendants also argue that the civil conspiracy claim must be dismissed because plaintiff cannot allege an underlying tort. As discussed earlier:

> A civil conspiracy is not a per se, stand-alone cause
> of action; it is instead a legal doctrine under which
> liability for a tort may be imposed on people who did
> not actually commit a tort themselves but who shared a
> common plan for its commission with the actual
> perpetrator(s). . . .  A civil conspiracy must
> therefore be based on an underlying tort or wrong.
> O'Dell v. Stegall, 226 W. Va. 590, 703 S.E.2d 561, 596
> (2010).

Blankenship v. Napolitano, 451 F. Supp. 3d 596, 620 (S.D.W. Va.

2020) (Copenhaver, J.).

In this case, because Count V, the Intentional Interference

with Contract or Contract Expectancy claim, has not been

dismissed and could arguably serve as an underlying tort in

support of plaintiff's civil conspiracy claim, the court declines

to dismiss the civil conspiracy claim at this juncture.[6]

IV.  Conclusion

For the reasons expressed herein:

1)   the motion to dismiss filed by the "hospital
     defendants" (ECF No. 46) is **DENIED;**

2)   the motion to dismiss filed by the "individual
     defendants" (ECF No. 48) is **GRANTED** as to defendants
     Lilley, Sinicrope, Ellington, Long, Daniel, Gee,
     Hopkins, Lane, Martin, and Ross;

3)   National Practitioner Data Bank's motion to dismiss or,
     in the alternative, for summary judgment (ECF No. 64)
     is **GRANTED;** and

4)   Plaintiff's motion to strike (ECF No. 60) is **DENIED** as
     moot.

---

[6] The court agrees with defendant that there is no tort for
injuring a person's trade or business and plaintiff has failed to
cite any legal authority that West Virginia recognizes such a
tort.

In her opposition memoranda to the motions to dismiss, plaintiff requests leave to amend her Amended Complaint in the event the court grants defendants' motions.  Plaintiff did not file a motion for leave to amend, submit a proposed second amended complaint, or indicate what changes she would make to an amended complaint that would survive a motion to dismiss. Therefore, the court is unable to properly evaluate whether plaintiff can satisfy the standard for granting leave to amend under Federal Rule of Civil Procedure 15(a).  For this reason, her request for leave to amend is **DENIED**.  See Cozzarelli v. Inspire Pharms., Inc., 549 F.3d 618, 630-31 (4th Cir. 2008) (no abuse of discretion in declining to grant leave to amend where plaintiffs did not file a motion, but rather, only asked for leave to amend in their opposition to motion to dismiss and objections to magistrate judge's report).

The Clerk is directed to send copies of this Memorandum Opinion and Order to all counsel of record.

IT IS SO **ORDERED** this the 30th day of September, 2020

ENTER:

David A. Faber
Senior United States District Judge

25